**Kate FRAZIER, with her best friends and parents, Bradford and Judith Frazier, Plaintiffs,**

v.

**FAIRHAVEN SCHOOL COMMITTEE, et al., Defendants.**

**Civil Action No. 99–10102–RCL.**

United States District Court, D. Massachusetts.

Nov. 22, 2000.

---

**106**

Michael W. Turner, Marion, MA, for Plaintiffs.

Elizabeth M. Fahey, Gerald Fabiano, Pierce, Davis, Fahey & Perritano, LLP, Boston, MA, for Defendants.

### MEMORANDUM AND ORDER

LINDSAY, District Judge.

Before the court is the defendants' motion, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss the complaint for failure to state a claim upon which relief may be granted. For the reasons set forth below, the defendant's motion to dismiss is GRANTED.

### Introduction

The plaintiffs, Kate Frazier ("Kate") and her parents, Bradford and Judith Frazier ("parents" or "Kate's parents"),[1] have

1. Kate and her parents collectively are referred to in this memorandum and order as

brought suit against the Fairhaven School Committee; the superintendent of Fairhaven Schools, Bernard F. Roderick; the principal of Fairhaven High School, John Newburn ("Newburn"); the guidance counselor of Fairhaven High School, Paul McCabe ("McCabe"); and the discipline matron of Fairhaven High School, Marie Morency ("Morency"). Although the plaintiffs make a variety of allegations under various federal and state laws, the gist of their claims is that Kate, a former student at Fairhaven High School, was not provided with a free appropriate public education.

The plaintiffs, however, did not bring a claim under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400–91 ("IDEA"), which guarantees individuals a free appropriate public education. Instead, the plaintiffs' claims largely are asserted under other federal statutes, including various federal civil rights acts (42 U.S.C. § 1983, § 1985(3), and § 2000d); section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794); the Violence Against Women Act (42 U.S.C. § 13981); Title IX of the Education Amendments Act of 1972 (20 U.S.C. § 1681); the Family Educational Rights and Privacy Act (20 U.S.C. § 1232); and the Revenue Sharing Act of 1972 (31 U.S.C. § 6716). The plaintiffs also allege intentional infliction of emotional distress and assert claims under the Massachusetts Tort Claims Act (M.G.L. c. 258).

### Allegations of the Complaint

■ The amended complaint (the "complaint") makes the following allegations. On a motion to dismiss, all factual allegations in the complaint are taken as true. *Aulson v. Blanchard,* 83 F.3d 1, 3 (1st Cir.1996).

In March, 1995, the spring of Kate's first year in high school, Ralph Tripp ("Tripp"), special education director of

"the plaintiffs."

Fairhaven High School, determined that Kate was likely suffering a learning disability, Attention Deficit Hyperactivity Disorder (ADHD). Kate was thereafter evaluated by the school psychologist, Michael Childs ("Childs"). Childs' evaluation confirmed Tripps' determination. Childs mailed a copy of his evaluation to Kate's parents, but school officials apparently did not provide Kate's parents with information about their rights under section 504 of the Rehabilitation Act at that time; nor did school officials then present Kate's parents with an "accommodation plan" (presumably an Individualized Education Plan ("IEP")). In late October, 1996, approximately a year and a half after Child's performed his evaluation, Kate's parents met with several of Kate's teachers. Following the meeting, Childs told Judith Frazier, Kate's mother ("Kate's mother"), that he was changing Kate's "504 plan." After Kate's mother informed Childs that she knew nothing of the plan, Childs provided her with information concerning the plan the next day.

In the autumn of 1996, a number of incidents occurred that caused Kate distress. She was confronted by Morency, the "discipline matron," who "leer[ed] at her and invade[d] her privacy" when she telephoned her mother from school. The school nurse mentioned Kate's medication in the presence of other school staff, and the school secretary refused to give Kate lunch money that her mother had left for her, until Kate went to the nurse for medication. In November, Morency took Kate to the principal's office, where Kate was questioned. Feeling "agitated and claustrophobic," Kate left the principal's office and was subsequently suspended for her actions and for insubordination.[2] When Kate's mother asked Newburn, the school principal, whether this last incident was related to Kate's disability, Newburn laughed at the suggestion, prompting

Kate's parents to write a letter to the school complaining about Kate's treatment. Following the sending of that letter, Kate's parents, in December, 1996, met with Newburn, Childs, and Tripp. At this meeting, Newburn stated his belief that Kate had a behavior problem, rather than a disability.

Additional incidents occurred in the spring of 1997. In January, the vice-principal of the school told Kate she would be suspended for excessive absences and asked Kate to attend a School Committee meeting. In the plaintiffs' view, the School Committee was attempting to place Kate on probation and then expel her, rather than to provide the services to which Kate was entitled. Kate's parents and the plaintiffs' counsel met with Newburn, Tripp, and other school administrators and teachers to discuss Kate's attendance. At that meeting, one of Kate's teachers established that Kate's attendance record in fact was incorrect: Kate had not missed the number of classes indicated in that record. The school thereafter corrected Kate's attendance record. At the meeting, Kate's parents also were given a report from Kate's gym teacher that described Kate as a "troublemaker" and a "non student." Although the report was removed from Kate's file at the plaintiffs' request, the plaintiffs assert that the report demonstrates that school meetings were held to discuss Kate at which her parents were not present.

In February, 1997, an incident occurred in the girls' bathroom at the school. Morency looked directly into a bathroom stall that Kate was occupying, causing Kate great distress. The plaintiffs reported this incident, but no action was taken by the school. Following the plaintiffs' report of the incident, Morency "continued her practices" of "stalking," "approaching" and "scowling" at Kate.

**2.** The complaint is silent as to why Kate initially was brought to the principal's office and

what led to the suspension.

Additional events giving rise to the plaintiffs' claims occurred in the 1997–98 school year. In the fall of 1997, McCabe, Kate's guidance counselor, refused to allow Kate to transfer from one class to another, despite earlier assurances that the system was flexible as to transfers. During a meeting with Kate to discuss the transfer, McCabe told someone on the telephone that Kate had not taken her medication. When Kate's father later asked McCabe to identify the person to whom McCabe had spoken, McCabe refused.

At some point thereafter, a meeting was held to discuss Kate's educational program. The school's attorney, "Mr. Sullivan;" Kate's parents; Lynne G. Turner M.Ed., identified in the complaint as the Frazier's "advocate;" and Tripp all were present. At that meeting, Sullivan stated that Kate was not "safe" at school and presented to Kate's parents the option of off-site tutoring. Kate's parents reluctantly accepted this proposal. In the fall of 1997, Kate's parents received an unsigned copy of an IEP. Kate's parents accepted the plan, but Newburn refused to sign it until "ordered" to do so by Sullivan. On November 13, 1997, the plaintiffs' attorney sent a letter to the Fairhaven Board of Selectmen giving notice that the plaintiffs believed the Fairhaven School Department was negligent and in violation of M.G.L. c. 258 in its treatment of Kate. In the fall of 1998, Kate was offered and accepted an IEP for the 1998–99 academic year to allow her to complete graduation requirements. Kate's parents rejected portions of the IEP; their rejection was reported to the Massachusetts Bureau of Special Education Appeals, but the issues were resolved before a hearing was held.

Kate received a high school diploma in the spring of 1999.

## Discussion

### I. *Standard: Motion to Dismiss.*

On a motion to dismiss, the court "must accept the complaint's allegations as true, indulging all reasonable inferences in favor of [the plaintiff]." *Kiely v. Raytheon,* 105 F.3d 734, 735 (1st Cir.1997). Dismissal is proper only if "the factual averments do not justify recovery on some theory adumbrated in the complaint." *Rogan v. Menino,* 175 F.3d 75, 77 (1st Cir.1999), *cert denied,* 528 U.S. 1062, 120 S.Ct. 616, 145 L.Ed.2d 511 (1999).

### II. *Plaintiffs' Federal Claims.*

#### A. *Claims under 42 U.S.C. § 1983.*

Count I of the complaint alleges that the defendants "deprived [Kate] of her statutorily protected, civil rights to a F.A.P.E. [free appropriate public education]," in violation of section 1983. To address this claim, it is necessary that I discuss first the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*

The IDEA is a "comprehensive education statute that seeks to ensure that children with disabilities receive a free appropriate public education." *Rose v. Yeaw,* 214 F.3d 206, 209 (1st Cir.2000). The IDEA permits judicial review of disputes regarding educational programs, but specifies an administrative process that aggrieved parties must pursue before judicial review becomes available. 20 U.S.C. § 1415(f)–(g). This process includes a hearing that is broad in scope, "encompassing 'complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child.'" *Rose, supra,* 214 F.3d at 210 (quoting 20 U.S.C. § 1415(b)(6)). Moreover, while the IDEA does not restrict the rights of children with disabilities to sue under other federal statutes, it does require that "before the filing of a civil action under such law seeking relief that is also available under [the IDEA]," the IDEA's own administrative procedures "shall be exhausted to the same extent as would be required had the action been brought under [the IDEA]." 20 U.S.C. § 1415(*l*).

There are exceptions to the exhaustion requirement. "A plaintiff does not have to exhaust administrative remedies if she can show that the agency's adoption of an unlawful general policy would make resort to the agency futile, or that the administrative remedies afforded by the process are inadequate given the relief sought." *Rose, supra,* 214 F.3d at 210–11. It is the latter exception that is of interest in this case. In brief, the plaintiffs' argument is as follows: (1) they are seeking only compensatory and punitive damages under section 1983; (2) compensatory and punitive damages are not available under the IDEA; (3) thus, since these damages are not "relief that is also available" under the IDEA, the administrative exhaustion requirement does not apply.

Some courts have adopted this line of reasoning, allowing to proceed, as section 1983 claims without exhaustion of administrative remedies, those claims based on rights guaranteed in the IDEA that allege only monetary damages. *See Covington v. Knox County School System,* 205 F.3d 912 (6th Cir.2000); *Witte v. Clark County School District,* 197 F.3d 1271, 1275 (9th Cir.1999); *W.B. v. Matula,* 67 F.3d 484, 494, 496 (3d Cir.1995).

Other courts, however, have rejected the idea that plaintiffs may avoid the administrative requirements of the IDEA simply by limiting their requests for relief to monetary damages. Essentially, the rationale for this latter approach is that the exception would swallow the rule. Allowing plaintiffs to "opt out" of the IDEA simply by claiming money damages under other statutes would undermine the congressional purpose of the IDEA, namely to ensure educational opportunities for children with disabilities through established administrative procedures of local boards of education. As the Eleventh Circuit commented, "future litigants could avoid the exhaustion requirement simply by asking for relief that administrative authorities could not grant. This goes against the very reason for the existence of an exhaus-

tion requirement, which is '[to prevent] deliberate disregard and circumvention of agency procedures established by Congress.'" *N.B. v. Alachua County School Board,* 84 F.3d 1376, 1379 (11th Cir.1996) (quoting *Ass'n for Retarded Citizens of Alabama v. Teague,* 830 F.2d 158, 160 (11th Cir.1987)). *See also Charlie F. v. Board of Education of Skokie School District* (98 F.3d 989 (7th Cir.1996)); *W.L.G. v. Houston County Board of Education,* 975 F.Supp. 1317, 1327 (M.D.Ala.1997) ("permitting a plaintiff to avoid administrative process simply by requesting money damages or other relief outside the authority of the due-process hearing officer would, in practical effect, do away with the exhaustion requirement"); *Buffolino v. Board of Education of Sachem Central School District,* 729 F.Supp. 240, 247 (N.D.N.Y.1990) ("plaintiffs could avoid administrative procedures merely by asking for relief that administrative authorities could not grant").

■ There is no controlling First Circuit precedent with respect to whether a plaintiff alleging only monetary damages under section 1983 is excepted from the exhaustion requirement. In two recent cases, however, that court, in passing, has noted this "complex issue." *Rose, supra,* 214 F.3d at 211, n. 2; *Weber v. Cranston School Committee,* 212 F.3d 41, 53, n. 13 (1st Cir.2000). In the absence of controlling precedent in this circuit, and to resolve the issues now presented, I adopt the view that administrative exhaustion, as required by the IDEA, is necessary even where plaintiffs seek only monetary damages under section 1983. The Seventh Circuit's opinion in *Charlie F.* is particularly persuasive. There the court made plain that "what relief is 'available' does not necessarily depend on what the aggrieved party wants." 98 F.3d at 991–92. The court explained: "The nature of the claim and the governing law determine the relief no matter what the plaintiff demands. If this principle is equally applicable for purposes of § 1415(f), then the

theory behind the grievance may activate the IDEA's process, even if the plaintiff wants a form of relief that the IDEA does not supply." *Id.* at 992. In other words, because the underlying basis for the plaintiffs' section 1983 claim is a violation of the IDEA, the administrative processes established under IDEA must be followed.

The Seventh Circuit emphasized the importance of fact-finding by the "educational professionals and hearing officers who evaluate claims under the IDEA," and who "may conclude (a) that adequate remedial services can be provided, or (b) that [the plaintiff] does not today require services." *Id.* As the court stated: "The first outcome would show that relief is available under the IDEA; the second would provide information relevant to [the plaintiff's] claims under statutes other than the IDEA. In either event, pursuit of the administrative process would be justified." *Id. See Christopher W. v. Portsmouth School Committee*, 877 F.2d 1089, 1094 (1st Cir.1989) (exhaustion doctrine "enables the agency to develop a factual record, to apply its expertise to the problem, to exercise its discretion, and to correct its own mistakes, and is credited with promoting accuracy, efficiency, agency autonomy, and judicial economy").

As the *Charlie F.* court suggested, the key issue in evaluating what is essentially an IDEA claim is whether the plaintiff in fact received a free appropriate public education. Many courts have pointed out that state and local educational boards generally are in the best position to make that judgment. As the First Circuit has commented:

> The underlying issue ... whether the Department offered [plaintiff] the educational program to which she was entitled is a matter that calls out for resolution initially at the agency level. Working out a specific and final IEP ... calls for expertise and discretion; and, an initial independent review of the IEP at an agency level would serve the major purposes of the exhaustion

doctrine. Indeed, Congress specifically mandated such a review in 20 U.S.C. § 1415; and, a review of the cases shows that it has helped to clarify issues even when it has not resolved them.

*Ezratty v. Commonwealth of Puerto Rico*, 648 F.2d 770, 775 (1st Cir.1981) (dismissing claim for failure to exhaust).

Indeed, as the court noted in *Ezratty*, the structure of the statute assumes judicial review of a developed administrative record. *See* 20 U.S.C. § 1415(i)(2)(B)(i). The First Circuit more recently underscored this point in *Lenn v. Portland School Committee*: "While the IDEA envisions judicial review, the statute 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" 998 F.2d 1083, 1086 (1st Cir.1993) (quoting *Board of Education v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). Instead, the law "contemplates an intermediate standard of review on the trial-court level—a standard which ... falls well short of complete de novo review." *Id. See also Carey v. Maine School Administrative District # 17*, 754 F.Supp. 906, 923 (D.Me.1990) ("Congress made abundantly clear that courts should decide [IDEA] cases only after a serious and thorough examination of the records of the proceedings undertaken by education professionals and the insights of those experts into the problems of the subject child").

In *Carey*, the court held that administrative proceedings were necessary to "assess the propriety of the school district's educational placement decision, and consequently the propriety of reimbursing parents' educational expenses." *Id.* The difference between that situation and the instant case is insubstantial: although in *Carey* the plaintiffs sought money damages as reimbursement and the plaintiffs here seek compensatory money damages, in both situations "knowledgeable, yet independent, education professionals"

should be "the first line of review" to evaluate whether the educational services provided actually were adequate. *Id.*

The plaintiffs attempt to distinguish their case from *Charlie F.* on the theory that their dispute is not with Kate's most recent educational program, but rather with events that occurred earlier in her academic career. This distinction is not meaningful. In fact, at the time that the *Charlie F.* case was filed, "Charlie's parents believe[d] that his current educational program [was] apt." 98 F.3d at 993. This did not alter the court's view that exhaustion of administrative remedies was necessary. As the court explained:

> [T]he complaint ... filed on [Charlie's] behalf deals with acts that have both an educational source and an adverse educational consequence; the complaint contends that his education has suffered as a result of the events in fourth grade; if he is doing fine in school today, then it is hard to see what this case is about. It would be odd to award damages because of deeds with so little educational effect that no ongoing steps to overcome them are warranted—and again we are unwilling to allow parents to opt out of the IDEA by proclaiming that it does not offer them anything they value ...

*Id.* Accordingly, the fact that the plaintiffs are *seeking* only monetary damages is not dispositive. As the Seventh Circuit stated: "[b]oth the genesis and the manifestations of the problem are educational; the IDEA offers comprehensive educational solutions; we conclude, therefore, that at least in principle relief is available under the IDEA." [3] *Id.*

Furthermore, allowing a plaintiff to pursue an IDEA-based claim without exhausting administrative remedies, when that plaintiff already has graduated might simply encourage plaintiffs to wait to dispute the adequacy of their educational pro-

grams until after graduation precisely in the hope of recovering money damages. This would mean that plaintiffs would not actually address educational issues when they occur—a situation directly at odds with the IDEA's primary goal of ensuring the education of children with disabilities.

For all of these reasons, the plaintiffs' section 1983 claims are dismissed.

**B.** *Claims under Section 504 of Rehabilitation Act of 1973.*

■ Count IV of the complaint alleges that defendants violated section 504 of the Rehabilitation Act, because the defendants acted "with bad faith and gross misjudgment in making educational decisions" regarding Kate. Plaintiffs further allege that the school discriminated against Kate on the basis of her disability and deprived her of a free and appropriate education. Plaintiffs' claims are again rooted in an alleged violation of the IDEA. For this reason the claims must be dismissed, because the plaintiffs failed to exhaust the IDEA's administrative remedies. *See* 20 U.S.C. § 1415(*l*).

**C.** *Claims under the Violence Against Women Act.*

The Violence Against Women Act, 42 U.S.C.A. § 13981 was declared unconstitutional by the Supreme Court in *U.S. v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). Count V of the complaint alleges a violation of that statute and therefore is dismissed.

**D.** *Claims under 42 U.S.C. § 1985(3).*

■ Count VI of the complaint asserts that defendants violated section 1985(3) by conspiring to deny Fairhaven students a free and appropriate education. Because the gravamen of this count is an alleged violation of the IDEA, the plaintiffs' failure

---

**3.** Indeed, the First Circuit has recognized some flexibility in remedies under the IDEA. *See Pihl v. Massachusetts Department of Education,* 9 F.3d 184, 188 (1st Cir.1993)

(compensatory education available to student beyond the statutory age of entitlement for services "to remedy past deprivations").

to exhaust their administrative remedies, as discussed above, requires dismissal of this count. *See* 20 U.S.C. § 1415(*l*).

■ Furthermore, the plaintiffs substantively have failed to state a claim under section 1985(3). As the First Circuit recently held in *Aulson,* to state a claim under this statute, "plaintiffs must allege facts showing that (1) the defendants conspired against them because of their membership in a class, and (2) the criteria defining the class are invidious." 83 F.3d at 4. Count VI of the complaint alleges injury to "students and individuals of disadvantaged economic classes."[4] But, as *Aulson* noted, the Supreme Court has explicitly held that "a group defined by economic criteria does not constitute a class for purposes of § 1985(3)." *Id.,* citing *United Brotherhood of Carpenters v. Scott,* 463 U.S. 825, 837, 103 S.Ct. 3352, 3360–61, 77 L.Ed.2d 1049 (1983). Thus, even if the plaintiffs had alleged that they were members of the "disadvantaged economic class," which they did not do, their claim would fail.

### E. *Claims under 20 U.S.C. § 1681.*

Counts VIII and IX allege that Kate was subjected to a hostile and abusive educational environment in violation of Title IX of the Education Amendments Act of 1972, largely based on the February 1997 incident in which Kate was observed in a bathroom stall by Morency. Specifically, the plaintiffs allege that Morency "assault[ed] and sexually assault[ed] Kate" because Morency "did peek, leer, and stair [sic] through out [sic] the performance of Kate's bodily function." In addition, the plaintiffs allege that after Kate complained to school administrators that Morency had

observed her in the bathroom stall, Morency retaliated against her.

■ The facts alleged do not support the plaintiffs' claim that Kate was "assault[ed] and sexually assault[ed]," and that she was subject to a hostile environment based on sex. Among the factors that a plaintiff must prove to succeed in a hostile environment claim is that "the harassment was based upon sex." *Brown v. Hot, Sexy and Safer Productions, Inc.,* 68 F.3d 525, 540 (1st Cir.1995), *cert. denied,* 516 U.S. 1159, 116 S.Ct. 1044, 134 L.Ed.2d 191 (1996) (citing *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 2405–09, 91 L.Ed.2d 49 (1986)). The plaintiffs have not alleged facts from which it reasonably can be inferred that Morency's action was of a sexual nature or based on Kate's sex. The complaint itself refers to Morency as the "discipline matron;" it admits that Morency "was responsible for the general discipline in the halls and ways of the School" and, as part of those duties, had "access to the girls only parts of the school, such as the ladies bath room [sic] and locker rooms." As the defendants state, "[w]ithout any allegation showing that Morency looked into the plaintiff's stall because she was a female rather than because it was her job to inspect the girl's rooms, no claim for harassment lies under Title IX." (Memorandum in Support of Defendants' Motion to Dismiss at 15).[5] As the First Circuit recently held, "in same-sex harassment cases as in all sexual harassment cases, the plaintiff 'must always prove that the conduct at issue was not merely tinged with offensive sexual connotations,' but in fact constituted discrimination 'because of … sex.'" *Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d 252, 258 (1st Cir.1999) (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 1002, 140

---

4. The complaint does not allege, however, that the plaintiffs are members of such classes.

5. The complaint makes reference to other episodes in which Morency is said to have fol-

lowed, intimidated, and pointed and scowled at Kate. There is no allegation, however, that these incidents were of a sexual nature or based on Kate's sex.

L.Ed.2d 201 (1998)).[6]

The plaintiffs' other allegations under Title IX are likewise without merit. As to the alleged failure to investigate Morency's conduct, the response is simple: because Morency's conduct did not create a hostile environment based on sex as the plaintiffs claim, the failure to investigate the conduct cannot form a basis for liability. *See McDonnell v. Cisneros,* 84 F.3d 256, 261 (7th Cir.1996); *Karibian v. Columbia University,* 930 F.Supp. 134, 148 (S.D.N.Y. 1996) (no liability for failure to investigate sexual harassment complaint "where it is determined that no sexual harassment occurred").

■ For similar reasons, the plaintiffs' claim of retaliation also are dismissed. To prove retaliation the plaintiffs must allege facts sufficient to show: "(1) protected participation or opposition under Title [IX] known by the alleged retaliator; (2) an ... action or actions disadvantaging persons engaged in protected activities; and (3) a causal connection between the first two elements[,] that is[,] a retaliatory motive playing a part in the adverse ... actions." *Hazel v. U.S. Postmaster General,* 7 F.3d 1, 3 (1st Cir.1993) (discussing retaliation under Title VII; citing *Petitti v. New England Tel. & Tel. Co.,* 909 F.2d 28, 33 (1st Cir.1990)).[7]

■ First, the complaint does not indicate that the plaintiffs told any of the named defendants that the plaintiffs believed Kate had been subjected to discriminatory treatment based on sex; nor does the complaint allege that Morency herself knew that Kate had complained to anyone about the bathroom incident.[8] Furthermore, while the plaintiffs state that Kate was retaliated against for her complaint about Morency's conduct, the plaintiffs do not allege facts showing any repercussions arising from her complaint. Indeed, the facts as alleged show that Morency's conduct toward Kate did not change following the bathroom incident. Because the plaintiffs have not alleged facts sufficient to demonstrate the elements of a retaliation claim, the retaliation claim fails.

### F. Claims under 20 U.S.C. § 1232.

■ Count X of the complaint alleges that the defendants did not maintain the confidentiality of Kate's student records and thereby violated the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232. The claim in Count X is based solely upon FERPA itself. As such, the claim must be dismissed, because FERPA itself does not provide for a private right of action. *See, e.g., Falvo v. Owasso Independent School District,* 229 F.3d 956, 967 (10th Cir.2000) ("The only remedy Congress provided within FERPA itself is allowing the Secretary of Education to cut off funding to educational institutions that violate the statute."); *Fay v. South Colonie Central School District,* 802 F.2d 21, 33 (2d Cir. 1986); *Achman v. Chisago Lakes Independent School District,* 45 F.Supp.2d 664, 672 (D.Minn.1999) ("[FERPA] itself does not expressly authorize a private cause of action, nor does one arise 'by inference' ") (quoting *Girardier v. Webster College,* 563 F.2d 1267, 1276–77 (8th Cir.1977)).

---

**6.** *See Hopkins v. Baltimore Gas and Elec. Co.,* 77 F.3d 745, 753 (4th Cir.1996), *cert. denied,* 519 U.S. 818, 117 S.Ct. 70, 136 L.Ed.2d 30 (1996) ("while harassment directed toward an individual ... by another individual of the same gender may be actionable if it is directed at the [individual] "because of" the [individual's] gender, the plaintiff must overcome the presumption in that circumstance that the harassment was not "because of" that [individual's] gender").

**7.** Courts addressing sexual harassment claims under Title IX routinely follow the guidance of cases addressing sexual harassment under Title VII. *See Brown, supra,* 68 F.3d at 540 ("[b]ecause the relevant caselaw under Title IX is relatively sparse, we apply Title VII caselaw by analogy").

**8.** The complaint alleges only that, "Kate and her parents did report this incident to various school personnel, including but not limited to Michael Childs, School Psychologist." Comp. ¶ 91.

**114**

G. *Claims under 42 U.S.C.A. § 2000d.*

■ Count XI of the complaint alleges a violation of section 2000d, which forbids discrimination in any program or activity receiving federal financial assistance on the basis of "race, color, or national origin." The complaint alleges only that Kate was discriminated on the basis of sex and disability and thus does not state a claim under this statute.

H. *Claims under 31 U.S.C.A § 6716.*

■ In addition to section 2000d, count XI of the complaint makes reference to another federal statute. Although the plaintiffs mis-cited this statute both in the complaint (referring to it as 31 U.S.C.A. § 1221), and in their motion papers (referring to it as 31 U.S.C.A. § 1231), they apparently seek to raise a claim under the Revenue Sharing Act of 1972, 31 U.S.C.A. § 6716. That statute provides federal financial assistance to state and local programs and activities, and simultaneously prohibits programs and activities that have received such financial assistance from discriminating on the basis of race, color, national origin, sex, age, disability, or religion. The statute does allow private causes of action by those alleging discrimination by local government officials. The plaintiffs' claim must be dismissed, however, because the statute also contains an administrative exhaustion requirement, which the plaintiffs have not met. 31 U.S.C.A. § 6716(a)–(b).[9]

III. *State Claims.*

Count II of the complaint alleges a violation of the Massachusetts Tort Claims Act, M.G.L. § 258. Counts III and VII are virtually identical, and both allege intentional infliction of emotional distress. Be-

cause all of the plaintiffs' federal claims have been dismissed herein, the court declines to exercise jurisdiction over the remaining state claims. *See* 28 U.S.C. § 1367(c)(3); *Brown, supra,* 68 F.3d at 530, n. 1.

*Conclusion*

For the reasons stated above, defendants' motion to dismiss is GRANTED.

So ordered.

---

9. The November 13, 1997 letter from the plaintiff's attorney to the Fairhaven Board of Selectmen does not mention 31 U.S.C.A. § 6716 (or any preceding statute) and therefore cannot be deemed an "administrative complaint" sufficient to satisfy the exhaustion requirement. The language of § 6716(b) makes clear that such a complaint must specifically reference the statute; it states that administrative remedies are deemed exhausted after ninety days if the agency in which the complaint was filed either: "(1) issues a decision that the government has not failed to comply *with this chapter;* or (2) does not issue a decision on the complaint." 31 U.S.C.A. § 6716(b) (emphasis added).